UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| DAVID SHAPNICK, | : | Case No. C-1-03-071 |
| | : | |
| | : | Judge Beckwith |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| LCA-VISION, INC., | : | |
| | : | |
| Defendant. | : | |

**<u>DEFENDANT'S TRIAL BRIEF</u>**

    Respectfully submitted,

    <u>s/ Mark J. Stepaniak</u>
    Mark J. Stepaniak  (0007758)
    Kerry P. Hastings  (0066871)
    Taft, Stettinius & Hollister LLP
    425 Walnut Street, Suite 1800
    Cincinnati, OH  45202-3957
    Telephone:  (513) 381-2838
    Fax:  (513) 381-0205
    stepaniak@taftlaw.com

    Trial Attorneys for Defendant

## I. JURISDICTION OF THE COURT

This Court has subject matter jurisdiction over Plaintiff David Shapnick's state law claim for promissory estoppel based upon diversity of citizenship pursuant to 28 U.S.C. § 1332.

## II. KIND OF ACTION

Plaintiff David Shapnick filed suit against Defendant LCA-Vision, Inc. ("LCA") because LCA did not employ him after he rejected LCA's offer by making a counteroffer after he quit his prior employment. The Court granted summary judgment in favor of LCA on Shapnick's breach of contract, fraud, and negligent misrepresentation claims. Only Shapnick's claim for promissory estoppel remains.

## III. STATEMENT OF FACTS

### A. Shapnick Is A Highly Educated Surgeon Who Has Typically Had Written Contracts Of Employment With His Employers.

Shapnick is an ophthalmologist. (Shapnick Dep. Exh. 2) After finishing his residency, Shapnick was hired by a clinic in Denver. (Shapnick Dep. 28) In this position, Shapnick had a written contract of employment. (Id. at 29)

After leaving this position, Shapnick was for a time self-employed in Colorado. (Shapnick Dep. 29) Shapnick next worked for the Colorado Ophthalmologic Association pursuant to a written contract of employment. (Id. at 44-45) Shapnick then moved to Montana and was self-employed in private practice there until the end of 1999. (Id. at 42-43, 46)

### B. Shapnick Worked For Restore Vision Pursuant To A Written Contract Negotiated With The Assistance Of Counsel.

In 2000, Shapnick began a new laser eye surgery business in the state of Washington called Restore Vision along with Craig Saxon and Steve Baldwin. (Shapnick Dep. 51-52) Restore Vision also employed Shapnick under a written contract. (Id. at 53) Shapnick hired an

attorney to assist him in the negotiation of this contract. (Id.) Shapnick and his attorney spent at least two months negotiating his employment contract with Restore Vision. (Id. at 55-56)

   **C.** **Based On Shapnick's Dissatisfaction With His Income And Restore Vision's Dissatisfaction With His Performance, Shapnick Seeks Out LCA.**

Shapnick was not satisfied with the situation at Restore Vision. Shapnick felt he was "grossly underpaid" under his written employment contract. (Shapnick Dep. 58) Shapnick asked Saxon and Baldwin to "modify this contract, do away with all these extra incentives that I didn't believe would ever happen and pay me kind of a standard wage or even slightly lower than the standard wage." (Id. at 60-61) In February or March of 2001, Baldwin and Saxon refused to renegotiate Shapnick's written contract. (Id. at 61)

Shapnick admits that Saxon criticized him for not being sufficiently productive and for having to redo surgical procedures too often. (Id. at 70-71, 75-76) Saxon and Baldwin suggested that Shapnick look for another position and Shapnick determined in April of 2001 that he would seek employment elsewhere. (Id. at 67-68)

Prior to Shapnick's decision to seek other employment, Shapnick had seen an LCA advertisement for surgeons. (Shapnick Dep. 93) In response, Shapnick called Steve Finney, LCA's recruiter, and told Finney he "was unhappy with his salary structure" and "would like to be in a better organization." (Id.) Finney told Shapnick he would get back to him. (Id.)

   **D.** **With Both Shapnick And LCA Expecting Any Employment Relationship To Be Established By A Written Contract, LCA Offered Employment To Shapnick And Sent Him A Written Contract Proposal.**

Shapnick met Finney at a convention in San Diego at the end of April 2001. (Shapnick Dep. 94, 97) They talked generally about various employment opportunities, including a planned new center in Woodbury, Minnesota. (Id. at 98) Finney encouraged Shapnick to consider Woodbury because Minnesota was LCA's biggest market and Finney thought Shapnick could make the most money there. (Id. at 98-99) By the end of this meeting, Shapnick knew

{W0495873.1}                           2

that LCA physicians had employment contracts and that LCA physician earnings were determined by a formula tied to personal productivity.  (Id. at 100)

On May 14, 2001, Shapnick interviewed at LCA's home office in Cincinnati.  (Shapnick Dep. 104; Shapnick Dep. Exh. 8)  After the interviews, LCA sent a representative to Washington to observe Shapnick perform surgery.  (Shapnick Dep. 128-129)

Between May 22 and May 24, 2001, Shapnick received an e-mail from LCA offering him a position in Minnesota.  (Shapnick Dep. Exh. 6; Shapnick Dep. 83-86)  In pertinent part, this e-mail stated:

> We are pleased to offer you a full-time position in our Minnesota Market.  **Steve Finney will have a contract to you before the end of the week.**

(Id.) (emphasis added)  Shapnick read this statement when he received the document.  (Shapnick Dep. 87)  In addition to the express statement regarding the sending of a written contract proposal containing the terms of LCA's offer, Shapnick knew previously that LCA surgeons had written employment contracts (id. at 100) and fully expected to negotiate a written contract (id. at 112, 157).

E. **Although Shapnick Had Not Received The Proposed Written Contract And Knew Nothing About Many Key Proposed Contract Terms, Shapnick Resigned His Position At Restore Vision Based On The E-mail.**

At the time Shapnick received the above e-mail (Shapnick Dep. Exh. 6), Shapnick knew little about the specific terms of LCA's offer.  (Shapnick Dep. 130-132)  Shapnick testified that Finney had said that LCA would "pay my moving expenses and reimburse me for my costs for license procurement in Minnesota and that was all."  (Id. at 131)  Shapnick does not remember any discussion of base compensation or how his compensation based on productivity would be calculated.  (Id. at 131-132)  Shapnick was not told about contract termination provisions.  (Id.)

Shapnick had not discussed the length of the contract.  (Id. at 150)  Shapnick summarized, "I was never told about most of the things in the contract."  (Id. at 132)

Despite his ignorance of virtually every material term of LCA's offer, and without having even received much less executed LCA's proposed written contract, Shapnick resigned his position at Restore Vision on May 24, 2001.  (Shapnick Dep. Exh. 4)  Shapnick emphasized that he only resigned after receiving the e-mail from LCA, which stated that he would receive a proposed written contract by the end of the week.  (Shapnick Dep. Exh. 6; Shapnick Dep. 83-84)

> **F.    After He Resigned From Restore Vision, Shapnick Received LCA's Proposed Written Contract And Sent It To His Lawyer For Review.**

Consistent with its e-mail (Shapnick Dep. Exh. 6), LCA sent Shapnick a proposed written contract, which Shapnick received around May 25, 2001.  (Shapnick Dep. 126; Shapnick Dep. Exh. 11)  Shapnick sent the proposed contract to his lawyer for review.  (Shapnick Dep. 154)

> **G.    Shapnick Sent LCA A Counteroffer On June 8, 2001.**

Shapnick's lawyer sent Shapnick a letter analyzing LCA's proposed contract and proposing many changes, including the start date (Shapnick Dep. Exh. 13 p. 2), termination provisions (id.), deletion of the covenant not to compete (id. at 3), indemnification provisions (id.), insurance provisions (id.), and how moving expenses would be reimbursed (id. at 4).  On June 8, 2001, Shapnick faxed his lawyer's letter to Finney with a handwritten comment:  "Steve these are some suggestions by my attorney."  (Id.; Shapnick Dep. 157)  LCA did not respond to Shapnick's fax.  (Id.)

> **H.    LCA Informed Shapnick That It Would Not Open A New Center In Minnesota At This Time.**

Later in June, Finney called Shapnick and told him that LCA would not be opening a new center in Minnesota due to a business downturn.  (Shapnick Dep. 159)  Instead, Finney offered

Shapnick a position in Richmond, Virginia which LCA was going to open "because they already had all the facilities there." (Id.) Shapnick rejected this offer. (Id. at 163)

### I. Shapnick Sent Finney A Proposed Contract Regarding Minnesota; Finney Rejected This Offer.

On July 31, 2001, Shapnick sent LCA a contract proposal which would have given Shapnick certain rights in Minnesota. (Shapnick Dep. Exh. 16; Shapnick Dep. 184) Finney rejected this proposal. (Shapnick Dep. 191-193)

### J. Shapnick's Subsequent Employment

After a period of unemployment, Shapnick accepted a position with Dr. William Fitzhugh in Twin Falls, Idaho in March 2002. (Shapnick Dep. 217) Shapnick began a cataract practice. (Id. at 222-223) After two or three cataract surgeries performed by Shapnick had complications, Fitzhugh would not permit Shapnick to perform any more cataract surgeries, which caused a major decrease in Shapnick's income. (Id. at 223-224)

Shapnick ultimately went to India for additional training in cataract surgery. (Id. at 224) After he returned from India, he "felt that my relationship with Dr. Fitzhugh was too deeply wounded to repair . . . ." (Id. at 224) Shapnick decided to return to private practice. (Id. at 225) In private practice, Shapnick would not "have the pressure on me from somebody else, to perform up to their standards." (Id. at 226)

Shapnick then moved to a small town in Montana and started his own general ophthalmology practice. (Id. at 230-231)

### IV. ISSUES OF LAW (SUBSTANTIVE)

### A. Legal Standard For Promissory Estoppel

A claim of promissory estoppel involves four elements: (1) there must be a clear and unambiguous promise; (2) the party to whom the promise was made must rely on it; (3) the reliance is reasonable and foreseeable; and (4) the party relying on the promise must have been

{W0495873.1}  5

injured by the reliance.  <u>Patrick v. Painesville Comm. Prop., Inc.</u>, 704 N.E.2d 1249, 1254 (Ohio Ct. App. 1997).

      **B.**    <u>**LCA Made No Clear And Unambiguous Promises To Shapnick.**</u>

In <u>Andersons, Inc. v. Consol, Inc.</u>, 348 F.3d 496 (6th Cir. 2003), the Sixth Circuit found that that the defendant's intent letter was conditioned upon the negotiation of a written lease.  <u>Id.</u> at 503.  The intent letter therefore did not constitute a "clear and unambiguous" promise sufficient to support a promissory estoppel claim.  <u>Id.</u> at 504.  Similarly, LCA's e-mail indicating an offer of employment (with unspecified terms) conditioned on the negotiation of a written contract was not sufficiently "clear and unambiguous" to support a promissory estoppel claim.

LCA's e-mail to Shapnick informed him that a written contract was coming.  (Shapnick Dep. Exh. 6)  Shapnick received and reviewed this e-mail **before** he "relied" by resigning from Restore Vision.  (Shapnick Dep. 84)  Any reasonable person would understand that a contract needed to be reached before Shapnick would become an LCA employee.  **And Shapnick specifically understood that point**; he had previous contracts of employment with his prior employers and "fully expected" to need to negotiate a written contract with LCA.  (Shapnick Dep. 157)  The notion that Shapnick would be employed by LCA even if they never reached agreement on a written contract is unsupported by **any** evidence.  At the very least, LCA did not make any "clear and unambiguous" commitment to Shapnick in light of the e-mail.

Shapnick attempts to transform an offer of employment into a clear and unambiguous promise that he had been hired.  It was clear and unambiguous to Shapnick that he would be offered employment and that the terms of the offer were going to be sent to him in a written contract.  The e-mail specifically stated that Shapnick was being **offered** a position (**not** that he had been **hired**) and that a contract would be sent to Shapnick before the end of the week.

{W0495873.1}         6

(Shapnick Dep. Exh. 6)  Shapnick received this e-mail and reviewed it **before** he resigned his position with Restore Vision.  (Shapnick Dep. 83-84)

### C. LCA Breached No Promises To Shapnick.

LCA made no promises to Shapnick upon which he relied other than to make an offer of employment in Minnesota and to send him a proposed written contract later that week.  (Shapnick Dep. Exh. 6; Shapnick Dep. 83-84, 87)  LCA indisputably fulfilled those promises.  Shapnick received what he bargained for--a chance to accept employment with LCA.  Shapnick rejected LCA's offer and made a counteroffer.

### D. Shapnick Acted Unreasonably By Quitting His Job Immediately.

Shapnick, a highly educated professional who had negotiated contracts with prior employers and who was assisted by counsel, acted unreasonably when he quit his job with Restore Vision before he even saw the terms of LCA's proposed written contract.  This is particularly true in light of the e-mail LCA sent Shapnick regarding its offer (Shapnick Dep. Exh. 6), which Shapnick reviewed before quitting.

The e-mail from LCA did not tell Shapnick to resign immediately, but specifically told him what he already knew, that a written contract was necessary.  (Shapnick Dep. Exh. 6)  Shapnick knew from his prior experience that it could take months to negotiate such a contract.  (Shapnick Dep. 55-56)  Shapnick knew he was not licensed in Minnesota (and that LCA therefore could not use him in Minnesota) and that the licensing process could take months.  (Id. at 151-152)  Shapnick had no reason based on his situation at Restore Vision to resign immediately.  (Id. at 87)

In Andersons, Inc. v. Consol, Inc., 348 F.3d 496 (6th Cir. 2003), the Sixth Circuit found that the possibility that negotiations over a written agreement would be unsuccessful made it unreasonable for the plaintiff to rely on a written intent letter that was conditioned on negotiating

a written lease agreement.  Id. at 505.  See also Baker v. Northwest Hauling, 2003 WL 21489619 (Ohio Ct. App. 2003) (applicant who allegedly quit prior job based on representation that she had been "hired" did not prove justifiable reliance because she knew job offer was contingent upon completion of a physical examination and paperwork).  Shapnick knew that all LCA surgeons had written contracts.  (Shapnick Dep. 100)  Shapnick was told in writing and **before** he quit his job with Restore Vision that a written contract was being sent to him.  (Shapnick Dep. Exh. 6)  Shapnick fully expected to need to negotiate a written contract with LCA.  (Shapnick Dep. 157)  The same possibility that was fatal in Andersons, that a written contract might not be successfully negotiated, was present in Shapnick's situation.  And this very real possibility came to pass because Shapnick rejected LCA's proposed written contract and made a counteroffer. (Shapnick Dep. Exh. 13)  There is no evidence supporting the assertion that LCA would have still employed Shapnick even had the parties never agreed on a contract (thereby making Shapnick the only LCA surgeon without a written contract).

In addition, Shapnick acted unreasonably because he did not have enough information about the terms of LCA's offer, as he quit his job with Restore Vision before he even received LCA's written contract.  Shapnick knew nothing about many essential terms of LCA's offer, including:  (1) what his pay would be (Shapnick knew the estimate provided by Finney was not a guarantee (Shapnick Dep. 131-132));  (2) how his pay would be calculated (id.); (3) termination provisions (id. at 132); and (4) contract duration (id. at 150).  Without even knowing LCA's proposals in these crucial areas, much less reaching agreement on these points, Shapnick could not reasonably rely on being employed by LCA at the time he quit his job.

  E. **Promissory Estoppel Damages**

A plaintiff asserting a promissory estoppel claim may recover *either* expectancy damages *or* reliance damages.  ZBS Indus., Inc. v. Anthony Cocca Videoland, Inc., 637 N.E.2d 956, 960

(Ohio Ct. App. 1994) (quoting <u>Ohio Knife Corp. v. A.C. Strip</u>, 1992 WL 308365 (Ohio Ct. App. Oct. 21, 1992)).  For the reasons stated in Defendant's motion in limine regarding expectancy damages and to limit reliance damages, Shapnick should not be awarded expectancy damages and should be awarded only reliance damages, if any.  As stated in Defendant's motion in limine, Shapnick's reliance damages should be limited to only those damages incurred up to the expiration date of his contract with Restore Vision.

For the reasons stated in Defendant's motion in limine regarding emotional distress damages and to strike attorney fees, those items are not available for promissory estoppel.

### V. ISSUES OF LAW (EVIDENTIARY)

Defendant is going to file an additional motion in limine regarding certain deposition designations made by Shapnick, particularly regarding Shapnick's attempt to introduce irrelevant and unfairly prejudicial evidence regarding the earnings and job performance of surgeons employed by Restore Vision under different employment contracts after Shapnick left.

                                Respectfully submitted,

                                <u>s/ Mark J. Stepaniak</u>
                                Mark J. Stepaniak  (0007758)
                                Kerry P. Hastings  (0066871)
                                Taft, Stettinius & Hollister LLP
                                425 Walnut Street, Suite 1800
                                Cincinnati, OH  45202-3957
                                Telephone:  (513) 381-2838
                                Fax:  (513) 381-0205
                                stepaniak@taftlaw.com

                                Trial Attorneys for Defendant

## **CERTIFICATE OF SERVICE**

I hereby certify that on August 16, 2005, I electronically filed a copy of Defendant's Trial Brief with the Clerk of Court using the CM/ECF System which will send notification of such filing to the following:  David Torchia, Tobias, Kraus & Torchia, 911 Mercantile Library Building, 414 Walnut Street, Cincinnati, Ohio 45202.

s/ Mark J. Stepaniak
Mark J. Stepaniak (0007758)
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH  45202-3957
Telephone:  (513) 381-2838
Fax:  (513) 381-0205
stepaniak@taftlaw.com
